No. 83,705

STATE OF KANSAS, *Appellee*, v. RODNEY WAYNE HENRY, JR.,
*Appellant.*
(44 P.3d 466)

Opinion filed April 26, 2002.

*John Edward Cash*, of Kansas City, Missouri, argued the cause, and *Kimberley Kellogg*, of Leawood, was with him on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant was convicted of first-degree murder, rape, and aggravated criminal sodomy. Defendant was sentenced to life in prison without eligibility for parole for 40 years for murder, 194 months for rape, and 146 months for sodomy. The rape and sodomy counts were run consecutive to the murder count. Defendant appeals, claiming (1) prosecutorial misconduct in the closing argument; (2) the trial court erred in admitting testimony of the victim's mother; and (3) the trial court erred in admitting the defendant's confession.

At approximately 10:50 a.m. on April 26, 1998, Lenexa police were dispatched to the Howard Johnson's motel in response to a call concerning a possible murder. In one of the guest rooms, the body of a nude white female was found in the bathtub lying on her back. The woman was identified as Claire Marie Monti. The officer noted a number of bruises on the woman's arms, chest, and legs, and a distinctive red mark under her left breast. There appeared to be pooling of blood in her lower extremities. A liquid, later determined to be shampoo, covered the woman's body. The bedspread from the motel's bed was missing. Officers checked nearby dumpsters for evidence.

A forensic neuropathologist examined the body before it was moved. Lividity was present. Abrasions and contusions were noted. The neuropathologist determined that Monti had been dead for a number of hours.

The following day, an autopsy was conducted. The coroner found 18 abrasions, 19 contusions, and 4 subgaleal hemorrhages (bleeding between the scalp and skull), and determined that there were probably four distinct blows to the head. All the abrasions were about the same age and had been inflicted shortly before death. Many of the abrasions had a faint woven pattern resulting from blows inflicted through cloth, such as clothing. One abrasion appeared to have resulted from the forward edge of a heel, suggesting that Monti had been stomped.

An internal examination of the body revealed a laceration to the liver, which was associated with approximately 50 milliliters of blood in the abdomen. Considerable force was necessary to lacerate the liver. All the injuries had been inflicted 4 to 6 hours prior to death and would have been painful.

The examination further revealed a significant amount of petechial hemorrhaging, which is consistent with a struggle. There was bruising in the muscles of the neck, indicating constriction of the neck by hands or a rope. The coroner observed asphyxial injuries to the exterior of the body, indicating strangulation. Petechial hemorrhages were concentrated over the eyes and forehead. There were scleral hemorrhages in both eyes.

The coroner also noted indications of sexual activity. There were three separate lacerations near the anus, suggesting anal penetration. All of the injuries were pre-mortem.

The forensic DNA analyst with the Johnson County Crime Laboratory collected swabs at the autopsy. The swab collected from the deceased's thigh contained semen. There was also semen on a towel recovered from the floor of the motel room.

John Applebury, a contractor in the remodeling business, employed Rodney Henry, and Henry's friend, Carl Dean Rails. Rails, who was lead carpenter/supervisor, had worked for Applebury for slightly more than 1 year. Henry had started working for Applebury as an assistant carpenter in February 1998.

On Monday, April 27, 1998, Rails paged Applebury, requesting an immediate return call. When Applebury returned the call, Rails told Applebury that he and Henry needed to talk to him because "something crazy had happened." Applebury told Rails to come his job site in Kansas City, Missouri, and they would discuss the problem.

When Rails and Henry arrived, they informed Applebury that they had murdered someone. Although Rails assumed the lead in telling Applebury the story, both men contributed to the conversation. They stated that they met a woman who was parked on the street. The woman indicated that she wanted to be with them, so they followed her in separate cars to her motel. Along the way, when Rails was pulled over by the police, Henry and the woman stopped their cars to wait for Rails. After the traffic stop, the three of them continued to the woman's motel room.

The men told Applebury that in the motel room the woman wanted to have sex with them, but "went stupid on [them]." Henry stated he helped Rails get control of the woman by pulling her arm behind her. Henry believed that he broke the woman's arm in the process. Rails stated to Applebury that he knew he had to kill the woman because the incident had escalated to where he was guilty of rape and battery, and at that point, he had no choice.

After the woman was killed, Rails and Henry cleaned up the room, removed the curtains, sheets, ashtrays, and everything else that might have fingerprints. They bundled the items in a bedspread, and later placed the bundle in a dumpster and lit a fire.

Henry wanted to cut up the woman's body and remove it in pieces from the motel room. Rails, who was worried that they would be observed taking the body out, suggested that, if discovered, they kill any witnesses. The men told Applebury that they had decided to leave the woman's body in the bathtub filled with water. At that point, Applebury told the men he did not want to hear any more about the murder.

The men had informed Applebury about the murder because if they became suspects, the police might contact their employer to locate them. They requested that Applebury give them an early warning if the police came looking for them. Applebury asked the

men if they thought they could live with what they had done. Both replied they could live with it. Applebury later called the TIPS Hotline from a public telephone. Applebury stated what he had been told and provided the police with the names and social security numbers of Rails and Henry.

After Henry was arrested, detectives interviewed him. Henry confessed to the murder. The interview was videotaped, and the tape was played to the jury at trial. On the videotape, Henry described meeting a woman from out of town in Westport. After the woman had drinks with Henry and Rails, they went to the woman's motel room. When the woman refused Rails' sexual advances, Rails "just lost it" and began hitting the woman. Rails attacked the woman on the floor, putting his hands around her throat and starting to choke her. She pleaded with him to stop and agreed to do anything Rails wanted. Rails said that it was too late and kept choking her.

When the woman began scratching Rails' face, Rails looked to Henry for help. Henry grabbed the woman's right arm and pulled it behind her back. The woman stopped moving and went limp. Rails kept squeezing the woman's neck. When Rails' hands began to tire and hurt, he asked Henry to get a towel. Henry got a towel and gave it to Rails. Rails wrapped the towel around the woman's neck and twisted it. Rails kept looking at the woman asking, "Are you dead, bitch?" Rails then ripped off the woman's clothes and began molesting her. After molesting the woman, Rails stepped on her chest, tried to rip her nipples off, kicked her in the chest, and then shoved a towel into her anus.

After the woman had died, the two men threw her body in the bathtub. Henry turned on the hot water. Rails laughed, grabbed shampoo, and poured it over the woman's body. Rails and Henry then wiped down everything in the room, left, and drove to a warehouse where they placed the woman's clothing and bed articles in a dumpster. They then lit the contents of the dumpster on fire to destroy the evidence.

Henry and Rails were charged and separately tried for the murder, rape, and sodomy of Monti. Henry testified at his trial. He admitted his role in the murder, but defended by asserting that

because of a mental defect, he had been incapable of forming the requisite intent for intentional murder.

Henry was convicted of the crimes charged and later sentenced. Henry appealed, asserting that he was denied a fair trial because of the prosecutor's improper comments in closing argument, the erroneous admission of testimony of Monti's mother, and the erroneous admission of his confession to the police.

### Admitting Defendant's Confession

In *Davis v. United States*, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994), the United States Supreme Court set out the circumstances for law enforcement to consider in determining whether a suspect has invoked or waived *Miranda* rights during questioning.

"The right to counsel recognized in *Miranda* is sufficiently important to suspects in criminal investigations, we have held, that it 'requir[es] the special protection of the knowing and intelligent waiver standard.' *Edwards v. Arizona,* 451 U.S. [477] at 483 [(1981)]. See *Oregon v. Bradshaw,* 462 U.S. 1039, 1046-1047 (1983) (plurality opinion); *id.,* at 1051(Powell, J., concurring in judgment). If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him. *North Carolina v. Butler,* 441 U.S. 369, 372-376 (1979). But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. *Edwards v. Arizona, supra,* at 484-485. This 'second layer of prophylaxis for the *Miranda* right to counsel,' *McNeil v. Wisconsin,* 501 U.S. 171, 176 (1991), is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights,' *Michigan v. Harvey,* 494 U.S. 344, 350 (1990). To that end, we have held that a suspect who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is actually present. *Minnick v. Mississippi,* 498 U.S. 146 (1990); *Arizona v. Roberson,* 486 U.S. 675 (1988). 'It remains clear, however, that this prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose.' *Connecticut v. Barrett, supra,* 479 U.S.[523], at 528 [(1987)]." 512 U.S. at 458.

The trial court conducted a hearing on the defendant's motion to suppress the videotaped confession made to officers investigating the murder of Monti and ruled:

"Prior to the evidentiary hearing on the Defendant's motion to suppress, State's Exhibit 1 which is the videotaped statement was delivered to me, and I watched

it completely, and I can tell you that I watched over and over again the portions from the time log on the tape from 215750 to 223810, and that encompasses just about everything we're arguing about here with the exception that at the commencement of the interview, Miranda Warnings were presented to the Defendant and a waiver was made at that time. Specifically at 215750, the Defendant asked to review the written waiver of Miranda, and makes the comment, 'So this means I can't talk to a lawyer' which one of the detectives says is not the case, and at 220320, Defendant states, 'I want to talk to a lawyer.' The tape, of course, speaks for itself, but in my view and my findings are that at that point, detectives terminated the interview, and the Defendant made the following remark. 'All right, guys. Wait a minute.' And shortly thereafter, 'Can I make a call to my girl and then we'll resume this?' At 221050, the Defendant indicates that he wants to talk to you again. At 221210, the following—or 221210 Defendant states, 'Do I need to talk to a lawyer? Do I need to have a lawyer say something to you? If I want to talk to a lawyer, is there one here?' Based on the more involved, of course, exchange that's presented on the tape, I think each of those three statements constitutes, at best, an ambiguous request. In fact, they might not constitute a request at all. But I think under the *Ninci* case, they are, at best, an ambiguous request for counsel. There are following several exchanges about whether the Defendant can go home if he talks, and then at 223810, Defendant states he wants to tell the whole story, and essentially proceeds to give a lengthy detailed version of events which took place.

. . . .

"I'm sure Defense counsel is correct that at some point in time here, Defendant is in custody. I don't think I need to make a finding as precisely when that occurred because my factual finding is that the Defendant made only one unambiguous request for counsel which is the one at 220320 on the tape, and then almost immediately withdrew that request and reinitiated the interview with the detectives, and that despite lengthy exchanges before he recommenced that statement, all of which are contained in Exhibit 1, I do not find that any further unambiguous request for counsel was made. Therefore, the Defendant's motion to suppress any of that statement is denied."

## Our standard of review is as follows:

"When reviewing a trial court's decision as to suppression of evidence, an appellate court normally gives great deference to the factual findings of the trial court, but the ultimate determination of the suppression of evidence is a legal question requiring independent appellate determination." *State v. Shively*, 268 Kan. 589, Syl. ¶ 1, 999 P.2d 259 (2000).

See *State v. Ninci*, 262 Kan. 21, 44, 936 P.2d 1364 (1997); *State v. Longbine*, 257 Kan. 713, 717, 896 P.2d 367 (1995).

Henry contends that the portion of his statement taken after his first invocation of his right to counsel should have been suppressed because the subsequent conversation included statements of the officers that were "tantamount to" or the "functional equivalent of" conducting an interrogation in violation of his right to counsel.

At the suppression hearing, a detective who conducted the interview testified regarding Henry's first request for an attorney. The detective was asked:

"Q. And Detective Olney left the room to go retrieve [the waiver of *Miranda* Henry had signed at the inception of the interview]. At 10 p.m. Detective Olney came back in and at 10:02 p.m. Mr. Henry asked 'Since I signed this form does that mean I can't talk to a lawyer?' Did you answer the question?

"A. Yes, we did.

"Q. What did you tell him?

"A. I said, 'No. That's not what that means at all. What's on that paper is your rights.'

"Q. Did he say something after that then?

"A. Yes, he did. He said, 'I want to talk to a lawyer.'

"Q. Okay. Are you all trained as to what to do in an interview when a suspect says that?

"A. Yes.

"Q. What do you do?

"A. That's when we would stop the interview.

. . . .

"Q. And so what did you all do then when Mr. Henry said, 'I want to talk to a lawyer?'

"A. We both began to, or we stopped the interview. We were getting ready to get up and walk out. I had closed the book that I had which I was taking notes in.

"Q. Uh huh.

"A. I closed that. I was getting ready to stand up and with the intent of leaving the room. At that point Mr. Henry put his hand up and said, 'Wait a minute, guys.' And then there was some conversation and both Detective Olney and I asked him are you saying that you want to continue to talk to us.

"Q. Did he respond to that question?

"A. Yes.

"Q. Did you take that to be a re-initiation of contact?

"A. Yes, I did."

We have reviewed the pertinent parts of the videotaped interview. At first, Henry gave very little in the way of incriminating information. At approximately 11:58 p.m., Henry requested that

the officers allow him to review the *Miranda* form he had signed at the beginning of the interview. One of the detectives left the room to obtain the form. While the detective was out of the room, the other detective talked to Henry about honor, courage, and commitment—marine values (Henry had served in the marines). When the detective returned with the form, he did not immediately give the form to Henry, but instead began to review with Henry the facts they had already obtained. When Henry asked to see the form, the detective handed it to Henry. As Henry read, one of the detectives stated to Henry that they would get the story from Rails if they were unable to obtain it from him.

After reading the *Miranda* form, Henry asked if by signing the waiver he had given up his right to talk to an attorney. The detectives told Henry that he had not given up the right to an attorney—that the form was just an explanation of his rights. Henry then stated that he wanted to talk to an attorney and the detectives began putting their notebooks away. One detective asked Henry for his attorney's name. Henry said that he did not have an attorney and could not afford one.

The detectives immediately got up out of their chairs to leave. Henry stopped them, stating, "All right, guys, wait a minute." A detective asked Henry, "What are you telling me, we've got rules; we have to abide by what you said; it's up to you; we won't try to sway you." Henry said, "Can I make a phone call?" The detectives said that Henry could make the call, and asked, "Then do you want to come back and talk to us?" Henry said, "I just wanna make the call." The detectives then asked Henry to tell them what he wanted to do after the call. Henry said, "I want to call, then we can come back in here." The detectives said, "If you want to talk to us, you have to tell us." Henry then made a telephone call to his girlfriend. He could be overheard saying into the telephone, "I can go home, but I'm not going to, I'm staying here. I'll explain when I get home."

When the detectives and Henry returned to the interview room, a detective asked, "Do you want to talk?" Henry said, "Yes" and asked whether he needed an attorney. The detectives explained that they were not at liberty to give him that kind of advice. After

that point, there is a considerable length of time where the detectives tried to persuade Henry to tell his story, but Henry was reticent and remained silent for much of the time. The detectives informed Henry that they wanted to listen, but that there were rules they had to follow about questioning and they had to be sure that he wanted to talk. Henry agreed to talk, but stated that he would have to back up in the story and straighten out a few points. Henry then proceeded to confess to his role in the killing of Monti.

When Henry made an unambiguous request for an attorney, the officers immediately responded to it by terminating the questioning. Henry then stopped the detectives from leaving the room, asking them to wait. Henry was very clear that after he made a telephone call, he would be willing to talk further with the detectives. After making the call, Henry reconsidered his decision to resume the interview. It is the period after the phone call and before the confession that Henry claims was the functional equivalent of an interrogation that violated his right to counsel. We note that although Henry was at times reticent, the officers did not coerce or coax Henry to confess. We conclude that under the circumstances, Henry unequivocally withdrew his request for counsel before questioning resumed and there was no violation of the defendant's right to counsel.

### Prosecutor's Closing Argument

The insanity and diminished capacity defenses had been abolished by the legislature at the time of Henry's crimes. See *State v. Jorrick*, 269 Kan. 72, 81, 4 P.3d 610 (2000). After January 1, 1996, a defendant might claim a mental disease or defect as a defense if it was such that it negated the *mens rea* element of the crime. K.S.A. 22-3220 states:

"It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense."

Henry, who had confessed to killing the victim, raised this defense at trial.

Defense witness Dr. Douglas Hippe testified that Henry suffered from a mental disease or defect that impaired his ability to form criminal intent. Hippe testified:

"It appears from all of the records available and the testing, as well as the extensive diagnostic interviewing that Mr. Henry experiences a Chronic Posttraumatic Stress Disorder with respect to early childhood and adolescent experiences with verbal and physical abuse, as well as psychological and emotional abuse and . . . sexual abuse. This was compounded by extensive sexual abuse in adolescence, and left him with severe depression, low self-esteem, low self-worth, sensitivity to rejection, abandonment and a significant problem with alcohol, multiple other difficulties which included relationships and so on. Mr. Henry was very—was verbal and coherent at the time of the incident and the intensity of his affect during the period was very strong, which in some ways may seem appropriate to the situation which it was. It was no evidence of formal thought disorder either as to form or content at that time. There was no indication of thoughts in advance of the crime nor preparation. It appears as indicated that due to his—I'll use abbreviation PTSD and ASD symptoms—Mr. Henry was unable to substantially monitor control or change his behavior at the time of the incident. Mr. Henry was compromised by mental illness PTSD Chronic, the ASD, and the Dysthymia as well as to the extent that he lacked capacity to deliberate on his action, and in [a] rational manner, and could not premeditate his behavior nor form the intent in a rational state of mind. Mr. Henry showed an impairment of judgment at that time by way of his inability to weigh accurately benefits or risks of the different alternatives as indicated. And this is—the substance of intent is that in order to form intent, there have to be choices available, and you have to make those choices. And as I said, he was unable to weigh accurately benefits or risks of different alternatives as indicated. Thus, there's substantial interference with capacity to formulate or even recognize problems and then follow through on making appropriate decision. As a result, he was incapable of forming intent to the requirements of the law due to the indicated factors. The latter factors are not related to personality characteristics, but are rather psychological and emotional deficits. These are symptoms of PTSD and ASD and Dysthymia. Impaired ability to make choices from these options that were available in his environment. These resulted in disruption of his ability to integrate consciousness, identity, and memory."

The jury was instructed concerning evidence of mental disease or defect as it relates to the issue of whether Henry was able to form the necessary mental state for each offense charged. Instruction No. 9 provided:

"Evidence has been presented that the defendant was afflicted by mental disease or defect at the time of the alleged crime(s). Such evidence is to be consid-

ered only in determining whether the defendant had the state of mind required to commit the crime(s). You are instructed the defendant is not criminally responsible for his acts if because of mental disease or defect the defendant lacked the premeditation required to commit first degree murder, or the necessary intent to commit the crimes of first degree murder, second degree murder or voluntary manslaughter, or the necessary intent to aid and abet another in committing or attempting to commit any of the crimes charged."

Instruction No. 10 provided:

"If you find the defendant not guilty solely because the defendant, at the time of the alleged crime(s), was suffering from a mental disease or defect which rendered the defendant incapable of premeditation or possessing the required criminal intent, then the defendant is committed to the State Security Hospital for safe-keeping and treatment until discharged according to law."

In closing argument, the prosecutor reviewed Instruction No. 9 with the jury. The prosecutor read the instruction and then commented:

"It's sort of hard to understand. It's kind of complicated, isn't it? What that means when you boil it all out is find him not responsible because of mental disease or defect, you've got to be able to find he was so out of it that he didn't know that was a lady getting choked in the room; that he didn't help Carl Dean Rails at all; that he didn't grab her arm to keep her from scratching him; that he didn't go into that room with any sexual intent; that he didn't beat her; that he didn't help beat her; that he didn't watch out for Carl Dean Rails while he beat her; that he didn't get that towel for Carl Dean Rails because his hands were getting tired. You got to find all that is out of the picture, and we know that's not the case. He told us. He told us he did that. Now, he wants to get up here and mealy-mouth and whine and cry about how he's not responsible for it because he's had a hard life. That isn't what gets it."

The prosecutor's argument was an emotional misstatement of the law. A misstatement of the law, whether by prosecutor or by the court, denies the defendant a fair trial where the facts are such that the jury could have been confused or misled by the misstatement. See *State v. Moncla*, 262 Kan. 58, 69-70, 936 P.2d 727 (1997). According to the prosecutor, the jury had to find that Henry did not commit the alleged acts in order to find him not guilty by reason of mental disease or defect.

There was no objection to this portion of the prosecutor's closing argument. Generally, reversible error cannot be based upon mis-

conduct by the prosecutor during closing argument where no contemporaneous objection is lodged. *State v. Finley*, 268 Kan. 557, 571, 998 P.2d 95 (2000). However, if the prosecutor's statements violate a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection. 268 Kan. at 571.

If there was an objection or an alleged due process violation, appellate review of the effect of a prosecutor's improper remarks in closing argument is required. Such review involves a two-step process: (1) Were the remarks outside the considerable latitude the prosecutor is allowed in discussing the evidence; and (2) were the remarks so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial? 268 Kan. at 571-72.

We note that Henry admitted that he committed the acts, but claimed he was unable to form the requisite mental state for criminal responsibility due to his dependence on Rails and other factors set out in Dr. Hippe's testimony. Henry contends that the prosecutor's misstatement of the law denied him a fair trial because it confused the complicated issue of mental disease or defect as it related to his criminal intent and improperly shifted the burden of proof from the State to the defendant. The State does not address Henry's contention in its brief.

Here, the prosecutor's misstatement of the law must be considered in the context of the jury instructions given by the trial court. The instructions to the jury as to a mental defect or disease were correct statements of the law. Whether the trial court's jury instruction was sufficient to remove any confusion resulting from the prosecutor's clearly erroneous statement regarding the defense of mental disease or defect must be considered with the other issues of alleged prosecutorial misconduct.

Henry next contends that in his closing argument the prosecutor misrepresented the evidence and exaggerated the time that Monti suffered at the hands of her attackers. The jury was instructed in Instruction No. 6: "It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use

common knowledge and experience in regard to the matter about which a witness has testified."

The prosecutor had stated that the reason Henry lied about the events that night was

"[b]ecause the truth is too sickening. How do you go say to the cops or say to the jury, 'Yeah, we were going to have her that night. . . . We got back up there and she wasn't having none of it so things got a little bit rough?' Things got a little bit rough 12:30 to 3 a.m. Think about that. That tape you watched was three hours long. They had her in that room for almost the length of that tape? What do you think happens? Do you think it happens like he says where 2 or 3 minutes, kissing and bam, he chokes her to death, and they spend 10 minutes cleaning up and out of there? No. About twice as long as an average full length movie they got her in that room. When you think about feeling sorry for this guy, you think about how Claire Marie Monti died. You think about Mother's Day yesterday, and her mom how she must have felt. Now Claire Marie Monti will never have a chance to be a mother, this young professional sharp, security conscious woman . . . ."

Henry details the time period of Monti's ordeal and concludes that the prosecutor exaggerated when stating that Monti suffered 3 hours because the actual maximum time that lapsed from the time the men entered Monti's room until Monti died was less than 2 hours.

The evidence was that Monti returned to her motel room at 12:30 a.m. The dumpster fire which contained Monti's clothing and the room bedding was reported at about 3 a.m. Although the prosecutor misrepresented the time of Monti's ordeal, the prosecutor's comments were within the realm of fair comment on the evidence.

Henry also complains that the prosecutor called him a liar several times in closing argument. Dr. Handler had testified that Monti was alive when the injuries were inflicted. He observed no injuries that were inflicted after death; all the injuries were premortem. The prosecutor commented:

"We know in this case [Monti] was penetrated while alive. There's no question about it. Two expert witnesses said no question about it to a degree of reasonable scientific certainty that the woman was alive when somebody stuck something up her anus and tore it. That makes this man a liar."

"It couldn't have happened how he says it happened. It's impossible. It is absolutely impossible. If you believe the evidence in this case, if you believe Dr.

Young, believe Dr. Handler, [Henry is] a liar. Just like I told you in opening, you know why he's a liar? Because the truth is too sickening."

The State argues that the prosecutor's references were to evidence that discredited Henry's testimony, showing him to be untruthful and, therefore, were fair comments on the evidence rather than the prosecutor's objectionable personal opinions as to the credibility of the defendant. To support its claim of fair argument, the State relies on our statements in *State v. Pabst*, 268 Kan. 501, 504-09, 996 P.2d 321 (2000), and *State v. Campbell*, 268 Kan. 529, 539-43, 997 P.2d 726, *cert denied* 531 U.S. 832 (2000).

In *Pabst*, the prosecutor called the defendant a liar approximately 11 times during closing argument, attempted to bolster the credibility of State's witnesses, and attempted to alter the burden of proof. When evaluating the prosecutor's conduct, the *Pabst* court noted that Kansas Rules of Professional Conduct Supreme Court Rule 226 (2001 Kan. Ct. R. Annot. 305) and the American Bar Association Standards of Criminal Justice, 1 ABA Standards for Criminal Justice, Standard 3-5.8 (3d ed. 1993), prohibit prosecutors from expressing their personal beliefs or opinions as to the truth or falsity of any testimony or evidence or the guilt of the defendant. The *Pabst* court stated that the prosecutor, by expressing his personal opinion on the defendant's credibility and the credibility of the State's evidence, had placed before the jury unsworn testimony that should not have been considered and concluded that under the circumstances, the prosecutor's accusing the defendant of lying went beyond the traditional wide latitude afforded to prosecutors in closing argument. 268 Kan. at 506-07. The *Pabst* court then observed:

"Inherent in this wide latitude is the freedom to craft an argument that includes reasonable inferences based on the evidence. When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony *is not believable*. [The State argues if the testimony is not believable, a prosecutor may state to the jury that the witness is a "liar." The State fails to note the next sentence concludes:] However, the ultimate conclusion as to any witnesses' veracity rests solely with the jury." 268 Kan. at 507. (Emphasis added.)

The State asserts that *Pabst* has been misinterpreted as standing for the proposition that it is always improper for a lawyer to comment on a witness' credibility. See, *e.g., State v. Hazley*, 28 Kan. App. 2d 664, Syl. ¶ 1, 19 P.3d 800 (2001). We disagree with the State's overly broad interpretation of *Pabst* which fails to note that the *Pabst* court stated: "The reason for prohibiting a prosecutor to comment on the credibility of a witness is that expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case." 268 Kan. at 510.

The State contends that *Campbell* accurately demonstrates that there are fair comments on a witness' credibility based on witness testimony that is in contravention of unassailed evidence. In relying on our statements in *Pabst* and *Campbell* for support, the State disregards our statement in *Campbell* distinguishing the two cases. The *Campbell* court stated:

"We need not restate the law which is fully set forth in *Pabst*. The comments in this case do not rise to the level of those in *Pabst*. The comments were made without objection and fall under our contemporaneous objection rule. Furthermore, none of the comments about Malone, Bruce, or Ingram's testimony could be characterized as 'vouching' for their credibility. All of the complained of remarks were within the considerable latitude allowed by counsel during closing argument and were not erroneous." 268 Kan. at 541.

### Testimony of the Victim's Mother

Henry asserts that because he admitted he participated in killing Monti, the victim's mother's testimony was not relevant to the only issue at trial, *i.e.*, his mental defect. He contends the testimony was offered by the prosecutor for the sole purpose of prejudicing the jury against his defense, and that admission of the testimony over defendant's objection was an abuse of discretion. For support, Henry relies on *State v. Donesay*, 265 Kan. 60, 959 P.2d 862 (1998).

Relevant evidence is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b). When reviewing the mother's testimony to determine if the testimony was relevant, it is important to note that Henry had confessed to the murder and a videotape of the confession had been played to the jury. Henry

also testified at trial and admitted his role in the murder. Henry defended his acts by asserting that because of a mental defect he had been incapable of forming the requisite intent for intentional murder.

Normally, the admission or exclusion of evidence is measured by the harmless error rule. In determining if the erroneous admission of evidence is harmless, the court must consider if it is inconsistent with substantial justice, *i.e.*, affects the substantial rights of a defendant and, if not, whether this court can declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *Donesay*, 265 Kan. 60, Syl. ¶¶ 7, 8.

In *Donesay*, after damaging a previously stolen car, Donesay and a friend stole another car in Wichita. Even though they had broken into the steering column to start the car without keys, when they found a set of keys in the glove compartment, they put them in the ignition so that the car would not look stolen. After noticing one of the car's headlights was out, they decided they needed to get another car to avoid being stopped by police.

After picking up some friends but before locating another car to steal,

"Donesay and his companions saw a sheriff's patrol car traveling in the opposite direction. Officer Kevin Easter advised the dispatcher that he had observed a vehicle run a stop sign and that the driver appeared to be trying to lose him. Officer Easter made a U-turn and turned on his overhead lights. He advised the dispatcher that he was in pursuit and provided a description of the car as well as locations. In trying to get away from the officer, Donesay missed a turn, lost control, went through a fence, and drove into a residential yard.

"When the car had come to a stop, Donesay reached under the seat to get the gun, jumped out of the car, and ran. Donesay later told police that he did not think Officer Easter saw that he had a gun and that Easter did not shoot at him or tell him to drop his gun. The officer chased Donesay and several times told him to stop. As Donesay was trying to vault over a fence, Easter grabbed his leg. Easter pulled Donesay off the fence and they both went down. Within a very short time, Easter put his fingers in Donesay's mouth. With Donesay on his right side and Easter on top of him, Donesay put the gun over his shoulder and fired. Officer Bowker, who had arrived by then, heard two quick shots, a pause, and two more quick shots. Donesay testified that Easter "just faded away from me a little bit and I had to push him off a little bit." The defendant got up, saw Easter's

gun, and grabbed it. As Donesay was getting up, he saw someone with a flashlight come around the corner and heard a gunshot. When Donesay tried to run, he fell. After a police officer caught and handcuffed him, they found that Donesay had a gunshot wound in his leg, which he had accidentally inflicted himself.

"Officer Easter was shot at close range in the right forearm, right shoulder, back of the head, and the back of his neck. The bullet that entered the back of his neck traveled along his spinal column and through his right lung and liver, causing his death. Other injuries on his body included two small tears inside his lips, scrapes on his face, and a bite mark on his left leg." 265 Kan. at 62-63.

Donesay acknowledged that he had killed the officer, claiming he shot, not to kill the officer, but to escape capture. Donesay argued that under these circumstances he was not guilty of premeditated murder.

The wife of the murdered officer was called by the State as a witness. The defendant, who had stipulated that the pistol was the officer's weapon and that the officer was properly uniformed and who had no objection to the admission of a picture of the officer, objected, claiming that the widow's testimony was not relevant and served only to inflame the passions of the jury.

The widow testified in detail as to her relationship with the slain officer from when the two first met in high school, their first date, and their relationship in college. She testified as to her husband's goals and ambitions and how he had chosen a career in law enforcement and talked of eventually going to law school. She testified that her husband's brother was also in law enforcement. She recalled the circumstances of becoming engaged to be married, and she identified a photograph of the slain officer, evidently taken at their wedding.

The *Donesay* court, in a decision approximately 1 year prior to Henry's trial, noted:

"K.S.A. 60-401(b) provides that ' "[r]elevant evidence" means evidence having any tendency in reason to prove any material fact.' It is beyond clear that Mrs. Easter's testimony was irrelevant, prejudicial, and inflammatory. Her testimony may have been proper at sentencing, but the State's justification for her testimony at trial is meritless, to say the least.

"First, had Officer Easter lived, this would not be a case of premeditated murder, and second, had he lived, he could not have testified as did Mrs. Easter. Her testimony was obviously collateral to the charges against the defendant, and there needs to be some natural or logical connection between her testimony and the

inference or result her testimony is designed to establish. See *State v. Walker*, 239 Kan. 635, 644, 722 P.2d 556 (1986). Clearly, Mrs. Easter's testimony was not relevant to any material fact of the crimes charged. What is clear is that the inference or result intended was to improperly influence the jury and prejudice the defendant's right to a fair trial. There is no question that the admission of Mrs. Easter's testimony was error. This, however, does not end our inquiry.

"The question becomes whether the admission of testimony is reversible error. At oral argument, the State conceded it had no authority to support the admission of such evidence, and its best argument was that it was harmless error.

"In *State v. Fleury*, 203 Kan. 888, 893, 457 P.2d 44 (1969), we stated:

'Our Kansas harmless-error rule has been incorporated in the statutory law of this state. (See K.S.A. 60-261 and K.S.A. 62-1718.) Our harmless-error rule applies unless the error is of such a nature as to appear inconsistent with substantial justice. Our courts are directed to disregard any error or defect in the proceedings which does not affect the substantial rights of the parties.

'The federal harmless-error rule declared in [*Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967),] requires an additional determination by the court that such error was harmless beyond a reasonable doubt in that it had little, if any, likelihood of having changed the result of the trial.'

The court then proceeded to apply the double standard in finding 'the error was harmless beyond a reasonable doubt *and* did not affect the substantial rights of the defendant.' (Emphasis added.) 203 Kan. at 895.

"In *State v. Denney*, 258 Kan. 437, 905 P.2d 657 (1995), this court noted K.S.A. 60-261 and the numerous cases applying the statutory test of whether the substantial rights of a party had been prejudiced. We further stated:

'Although the standard of "harmless beyond a reasonable doubt" as applied to errors of a federal constitutional magnitude was recognized as more stringent than the one imposed by Kansas statutes, see *State v. Fleury*, 203 Kan. 888, 893, 457 P.2d 44 (1969), in recent years a similar standard has been applied in Kansas to errors not couched as constitutional violations. See *State v. Tyler*, 251 Kan. 616, Syl. ¶ 7, 840 P.2d 413 (1992); *State v. Johnson*, 231 Kan. 151, 159, 643 P.2d 146 (1982).' 258 Kan. at 445.

"Other courts have confronted this issue in similar contexts. In *People v. Bernette*, 30 Ill. 2d 359, 197 N.E.2d 436 (1964), as here, the defendant contended that testimony of the victim's widow was irrelevant and highly prejudicial and the purpose was to 'infuriate and inflame the jury against him.' 30 Ill. 2d at 371. The testimony at issue related to the fact that the victim left a widow with four minor children. Her testimony did not approach the extent and detail of Mrs. Easter's testimony in the present case. The State conceded the testimony was irrelevant but argued that it was not reversible error because the defendant did not object and the objectionable evidence was 'brought to the jury only incidentally.' 30 Ill. 2d at 372. The court found otherwise:

'The evidence in regard to the decedent's child and step-children was not brought to the notice of the jury incidentally, but was presented by a series of questions in such a way as to permit the jury to understand that it was a matter material and proper to be proved. If any doubt existed, it was removed when the prosecutor went to the extreme of eliciting the ages of the children involved. This entire segment of the evidence, having no relevance to guilt or innocence, could only have had the purpose of prejudicing defendant in the eyes of the jury "and to arouse in them anger, hate and passion." (*People v. Dukes*, 12 Ill. 2d 334, 340.) What part this inflammatory appeal to the jury played in the selection of the death penalty cannot be known. But defendant, no matter how reprehensible his crime, was entitled to have jurors consider both the matter of his guilt and punishment, uninfluenced by the circumstance that decedent's widow had been left to live alone with children of tender ages as the result of the homicide.

'And while no objection was made by the defense to the admission of such evidence, we believe, apart from considerations of a later claim that defendant's counsel was incompetent for not objecting, *that the irrelevancy and highly prejudicial nature of such evidence is so well established, that it was the duty of the court in a murder case to have refused it on its own motion (Cf. People v. Winchester*, 352 Ill. 237; *People v. Blevins*, 251 Ill. 381; *City of Chicago v. Pridmore*, 12 Ill. 2d 447.) It is always the duty of a trial court to control proceedings to insure that an accused receives a fair and impartial trial.' (Emphasis added.) 30 Ill. 2d at 372-73.

"In *People v. Logan*, 224 Ill. App. 3d 735, 586 N.E.2d 679 (1991), *Bernette* was discussed and applied:

'The testimony in the present case went far beyond that presented in [*People v. Yates*, 98 Ill. 2d 502, 456 N.E.2d 1369 (1983),] and [*People v. Free*, 94 Ill. 2d 378, 447 N.E.2d 218 (1983)]. Here, as in *Bernette*, the deceased victim's widow testified in response to a series of questions that she had three children, that the children were aged 10, 6, and 3, and that the eldest was not the child of the deceased. In addition, the prosecutor commented on both victims' families in opening and closing argument and a photograph showing the deceased victim with his wife and children was admitted into evidence. It also should be noted that, unlike *Bernette* where no objection was made, here, the testimony concerning the victims' families was admitted over defendant's objections.

. . . .

'In the present case, the evidence and comments complained of were precisely the kind of detailed discussion of the deceased victim's family that has been condemned by the supreme court. And unlike [*People v. Caballero*, 126 Ill. 2d 248, 533 N.E.2d 1089 (1989)], here, the evidence not only was uninvited, it was admitted over the strong objections of defendant. Moreover, in the present case, defendant challenged the sufficiency of the evidence against him in his original appeal and continues to do so in the present appeal.

. . . .

'We find nothing in the supreme court's language that requires us to conclude that introduction of evidence of a victim's family will always constitute harmless error when the death penalty is not imposed. Rather, the court appears to be saying that when the death penalty is not imposed, the question of whether introduction of such evidence constitutes harmless error will depend upon the manner in which the evidence is introduced.

'As noted above, the supreme court has ruled that the evidence in this case was not brought to the jury's attention incidentally but was presented in a manner that permitted the jury to believe it was material. (*Hope*, 116 Ill. 2d at 278.) The court also found that the comments about the victims' families made during opening and closing arguments were not invited by the defense and amounted to an improper appeal to the emotions of the jurors. Thus, the supreme court has already held that the manner in which the evidence was introduced served to prejudice the jury, and we find that the fact that the death penalty was not imposed does not require a different conclusion. See *People v. Tajra*, 58 Ill. App. 2d 479, 208 N.E.2d 9 (1965).' 224 Ill. App. 3d at 741-43.

"In *People v. Gallon*, 121 Mich. App. 183, 328 N.W.2d 615 (1982), the court determined that the eliciting of the officer regarding the defendant's asserting his right to remain silent was error. In response to the State's argument that the error was harmless, the court stated:

'The prosecutor also claims that the error was harmless. In determining whether error was harmless, we employ a dual inquiry. First, was the error so offensive to the maintenance of a sound judicial system as to require reversal and second, if not, was the error harmless beyond a reasonable doubt? *People v. Swan*, [56 Mich. App. 22,] pp. 31-32. The purpose of the first criterion is to deter prosecutorial and police misconduct. *People v. Wright (On Remand)*, 99 Mich. App. 801, 810-811, 298 N.W.2d 857 (1980). An error may be intolerably offensive to the maintenance of a sound judicial system if it was deliberately injected into the proceedings by the prosecutor, if it deprives the defendant of a fundamental element of the adversary process, or if it is of a particularly inflammatory or persuasive kind. *People v. Swan, supra*, p. 32. The purpose of the second criterion of the harmless error test is to safeguard the decisional process. Thus, if it is reasonably possible that in a trial free of the error complained of even one juror would have voted to acquit, the error was not harmless.' 121 Mich. App. at 188-89.

"In the present case, we apply a similar dual test in determining if the admission of Mrs. Easter's testimony was harmless. *State v. Sanders*, 258 Kan. 409, 418, 904 P.2d 951 (1995). First, we must determine if the admission of the evidence was inconsistent with substantial justice, *i.e.*, whether substantial rights of defendant were affected by the admission of Mrs. Easter's testimony. Second, if not, can we declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial?

"Here, the district attorney not only had Mrs. Easter testify, but also in her opening statement, over defendant's objection, told the jury in great detail what Mrs. Easter's testimony would be. The testimony was patently irrelevant and de-

liberately presented for the obvious purpose of inflaming the jury against the defendant. As such, it affected the defendant's right to a fair and impartial trial.

"As we previously discussed, the defendant offered to plead guilty to all charges except premeditated murder and aggravated robbery. The primary issue in the trial was whether the killing of Officer Easter was done with premeditation. The defendant did not deny he shot Officer Easter. There is no question of the defendant's involvement in this tragic occurrence. His offer to plead guilty to four counts was opposed by the State. Notwithstanding, the State intentionally injected the irrelevant and highly prejudicial testimony of Mrs. Easter into this trial. Her testimony was not relevant to any of the charges, but it was offered and admitted by the court as if it were. The jury could not consider the evidence fairly and impartially as to any of the charges. However, the only real question was whether the killing of Officer Easter was premeditated. The defendant basically admitted to everything except that he premeditatedly killed Officer Easter. Defendant, in his brief, noted:

'There was no independent substantial and uncontroverted evidence of Donesay's premeditated intent to kill Easter. There were no witnesses. There was no medical evidence as to the order in which Easter received the bullet wounds, whether it was the first shot or last that killed him. Officer Bowker testified at trial he heard two shots, a short pause, and two more shots. He conceded, however, that he had not mentioned the pause in his initial report, and that in a subsequent police interview he described the shots as being fairly rapid. He did not tell anyone about the pause in the cadence of the shots until after he met with the prosecutor. . . .

'There was no question the incident took place in a very short period of time. Donesay himself testified he did not intend to kill Easter. He testified he just got mad and shot Easter without thinking.' " 265 Kan. at 84-89.

## The *Donesay* court concluded:

"The purpose of the State's eliciting Mrs. Easter's testimony was not to identify the defendant as the killer, was not to show that he intended to kill Officer Easter, and was not to show premeditation. Her testimony was not intended to show the guilt of the defendant, and it did not. We can only conclude that it was intended to infuriate and inflame the jury against the defendant. We cannot objectively conclude the admission of the testimony was harmless error. The district attorney's insistence in presenting this testimony to the jury, and the trial court's allowing her to do it, affected the substantial rights of the defendant to a fair and impartial trial. Thus, we have no choice but to reverse the defendant's convictions." 265 Kan. at 89.

We note that Donesay was retried, convicted, and sentenced for the same crimes. His conviction was affirmed on appeal. *State v. Donesay*, 270 Kan. 720, 19 P.3d 779 (2001).

In this case, defense counsel objected to the emotional impact of using the decedent's mother to establish facts already in the record or available from other sources and the relevance of the testimony. Henry asserts that the admission of the victim's mother's testimony regarding the victim, the victim's character, and the victim's family relationships was irrelevant. There was no issue of premeditated murder. Henry admitted the killing; however, he claimed he lacked the mental state to be convicted of the offense charged. Therefore, the admission of the mother's testimony was irrelevant, patently improper, and reversible error.

The mother's testimony covers approximately 20 pages of the trial transcript's approximate 900 pages. When reviewing the mother's testimony we must first determine if her testimony was relevant to Henry's mental state and, if relevant, whether the probative value of the evidence was outweighed by its prejudicial nature. Second, if the evidence was not relevant, we must determine whether the admission of the mother's testimony was patently improper, such that it affected the defendant's right to a fair trial.

The victim's mother testified on direct examination as follows:

"Q. [Prosecutor Morrison] Would you state your name for us, please.
"A. Claire Monti.
"Q. Where do you live, ma'am?
"A. I live in Holland, Pennsylvania.
"Q. Where is that at?
"A. Just north of the city of Philadelphia north and east.
"Q. And is that the area where you're from originally?
"A.. Yes. From Philadelphia.
"Q. Are you married?
"A. Yes.
"Q. What is your husband's name?
"A. Victor.
"Q. How long have you been married to Victor?
"A. 34 years.
"Q. Do you have children?
"A. Yes.
"Q. How many?
"A. Three.
"Q. What are their names.
"A. Well, there were three. Claire Marie, Barbara, and Michelle.
"Q. Is Claire Marie, from your answer, deceased?

"A.   Yes.

"Q.   Hold old was she when she died?

"A.   She was 32.

"Q.   And how old are your other daughters?

"A.   Now?

"Q.   Yes.

"A.   Barbara is 32 now. And Michelle will be 31. Barbara has a birthday in July. She'll be 32 in July. And Michelle will be 31 September.

"Q.   So Claire Marie was the oldest?

"A.   She was the oldest. The first.

"Q.   And so she would have been 33 today, I guess?

"A.   Yes. Her birthday was April 17th.

"Q.   Ms. Monti, did she go by 'Claire' or 'Claire Marie?' How did that work?

"A.   Since her college days, she preferred her friends and people outside to call her 'Claire Marie' to distinguish her from myself, and also because that was her given name, so most of the people, yes, called her 'Claire Marie.'

"Q.   And describe her physically size wise.

"A.   Very tiny. Claire was about five foot one and a half, under five foot two. Very slightly built. Very small frame. Much smaller than myself. I'm shorter than Claire, but I'm bigger in the body.

"Q.   About what did she weigh?

"A.   She weighed about 95 pounds.

"Q.   And was she a college graduate?

"A.   Yes, she was.

"Q.   Where had she gone to college at?

"A.   Went to college at Rider University in Lawrenceville, New Jersey.

"Q.   And had she graduated?

"A.   Yes.

"Q.   What was her major or majors?

"A.   Her major—she had a double major. It was Finance and Accounting, and minor in Economics.

"Q.   And was she a CPA?

"A.   Yes. She was a Certified Public Accountant.

"Q.   Did she have an advanced degree?

"A.   Claire was working on her MBA. It was an independent study program, and she was also studying—she actually received, had just received her certificate as a Microsoft Certified Systems Engineer, so she was trying to fill out her background in computer hardware and software.

"Q.   Ms. Monti, I'm going to show you this photograph before I forget, State's Exhibit Number 1. Is that your daughter Claire Marie?

"A.   Yes, it is.

"Q.   Okay. You provided that photograph for us?

"A.   Yes, we did.

"Q.   How old—is that picture like a college picture or something?

"A.   She essentially looked the same.

"Q.   That was my next question. Had she changed much between that and the time of her death?

"A.   No.

"Q.   How did she do in college?

"A.   She did very well in college. She was a top student. She graduated summa cum laude and very—in the most difficult major in the school at a very well known, prestigious school. Her grade point average was·3.9 out of 4.0 and, she was sixth in her class.

"Q.   Did she—I don't really know how to phrase this. I call it 'neatnik.' Was she a neatnik like type person?

"A.   Very well organized. She liked to have everything well organized so, yeah. She preferred to have things in their place.

"Q.   And let me take that a step further. Was she the kind of person that everything was in order and had to be in order, or kind of bugged her, or she more like me?

"A.   Definitely got very upset if things were not.

"Q.   Things weren't going to be laying around her house?

"A.   Not if she could help it.

"Q.   Okay. Had she worked for any CPA firms?

"A.   Yes, she did. She worked for two public accounting firms. While she was in school, she had an internship with Arthur Anderson Company, and they hired her when she graduated for a full time employee. She worked with them for about three years or so. Later on, she worked for Delloitte and Touche for another three years. So those two firms. When she graduated, she had offers from all of them.

"Q.   Where was she working at the time of her death?

"A.   At the time of her death, she was working in Yardley, Pennsylvania, for a company called Prophet 21.

"Q.   What do they do?

"A.   They actually design and market and sell speciality software packages for mostly to distributors, distributorships, and it's the complete package to go from order entry inventory cash management, the whole bit.

"Q.   How long had she worked for Prophet 21?

"A.   About a year.

"Q.   What's a CPA do working for a junior company?

"A.   This software package included also all of the accounting modules such as the general ledger modules, in addition to just simple billing, invoicing and cash management, so they hired her because of her expertise in accounting, and because she was also very knowledgeable about computers, and it was a real big boom to them to have a CPA on their staff because you can't use—learn to use a software package properly in those modules, accounting modules unless you really know how to do accounting. So her expertise was that not only did she know their product and how it was to be used, but she could also help these people to use proper accounting procedures.

(The following was taken up at the bench with Court and counsel out of the hearing of the jury:)

"MR. GYLLENBORG [Defense Counsel]: Judge, I just want to again protect the record and lodge an objection, and I want to couch it this way. Certainly I think the State has an opportunity to put the parents on and establish what kind of—the fact she was here and they didn't hear from her again and things like that.

"This is different though obviously than a murder where a body is never found, and you have to establish regular pattern of behavior, and then that it's seized. I guess I would ask for a proffer before things get too emotional. And I'll be honest. I never tried a murder case. I don't know what the limits are of what can be asked, and whether this woman is allowed to break down on the stand in front of the jury. I would submit if we get that far along, we've crossed over again into pretty prejudicial, unfairly prejudicial testimony that isn't necessary that the jury hear in order to do their job. Am I making sure I'm clear on that objection? I don't know what else we are going to talk about.

"MR. MORRISON: I'm not going to ask her anything—I'll tie up with other evidence.

"MR. GYLLENBORG: If we start talking about what kind of a daughter was she, a wonderful person, and this woman starts crying, we're in trouble.

"MR. MORRISON: I don't think she's going to break down.

"MR. GYLLENBORG: That's why I'm up here now.

"MR. MORRISON: I know there are limits how far you can go with that.

"MR. GYLLENBORG: I want to make sure we are all aware of my concerns so that we can go up to the line but not cross it because once that starts and I object, I look like an asshole in front of the jury.

"MR. MORRISON: You already do. I'm not going to give her—

"MR. GYLLENBORG: I assume you're overruling the objection, but we understand.

"THE COURT: I'm not sure exactly what you're objecting to.

"MR. GYLLENBORG: My objection is to having her on the stand. Here is my objection. Relevance and materiality. In this particular case, there's no relevance to what she's saying. We know she was here. We know she got killed. We know what she did for a living. We already talked to the employer. There is my objection.

"THE COURT: Well—

"MR. GYLLENBORG: And it is a prejudicial issue.

"THE COURT: I don't think there's a pending question. It's hard to rule on an objection that way. Hopefully we can move along. I do understand your concern. I guess if it's an objection it's already been asked, it's overruled.

"MR. GYLLENBORG: Not so much the next question and pending question, but I guess I should have stood up, come up in the beginning. I'm not trying to look like an ogre and not let the State do their job and put mom on. I understand the limits Mr. Morrison restricts himself to.

(The proceedings continued in the hearing of the jury.)

"Q. (By Mr. Morrison) Ms. Monti, one thing I want to touch on is about this issue of organization and what I call rightly or wrongly kind of being a neatnik. You indicated that she was in order—excuse me—keeping things orderly, so on, so forth. She was into that a lot, is that correct?

"A. Yeah. She liked to keep things in order. She liked things that were well planned also.

"Q. So that's sort of, for want of a better word, like CPA mentality, what we think about people that are in that business?

"A. Right. You have to be detail oriented and you have to make sure that everything goes in the right spots.

"Q. And in fact, she was—when she was growing up, she would oftentimes label things and things like that, keep things absolutely—

"A. Yes.

"Q. —straight and where she knew where they could be found and so on, so forth and, in fact, I think I mentioned to you, asked you if your other daughters were like that. I would like to have my kids hang around with them for a while if they wanted. Is that true that she was—

"A. She had everything labeled, catalogued, and on computer. She knew exactly everything that she had. It was all computerized.

"Q. I'm not trying to make light of it, but it was not a situation where when somebody comes home or she comes home, she, like, drops her coat on the floor and, you know, clothes being strung out everywhere, that kind of deal; is that right?

"A. Not as a general rule. Though, if she was very tired, she might kick her shoes off or.

"Q. Maybe walk—

"A. She would pick them up and put them right close.

"Q. Walking around in stocking feet would probably be a pretty loose deal though, right.

"A. Yeah. She quite often would walk around without her shoes.

"Q. Ms. Monti, what were her work habits like?

"A. She worked very hard. She was a little bit of a perfectionist so she probably worked harder than she needed to, but she always felt that the extra effort was worth it.

"Q. Was she into music at all?

"A. She enjoyed listening to music. Yes.

"Q. Did she like live music?

"A. Recorded music. Any kind of music.

"Q. And had she ever been married?

"A. No.

"Q. And did—at the time of her death, did she have a boyfriend? Maybe not politically the way—

"A. At the time of her death, no, she didn't have a steady boyfriend.

"Q. Had she been engaged earlier in her life?

"A.    She was planning on marrying a person.

"Q.    That had ended several months earlier?

"A.    Yes. Six or eight months before that.

"Q.    And were you close to your daughter?

"A.    I was very close to my daughter.

"Q.    And what was your habit to talk to her on a regular basis?

"A.    We talked on a daily basis.

"Q.    And what about when she would be out of town?

"A.    When she was out of town, we also talked on a daily basis with the exception on this last trip.

"Q.    Okay. Did she have to travel a lot with Prophet 21?

"A.    There was a fair amount of travel. Yes.

"Q.    You said that with the exception of the last trip that she took, you talked everyday. Why didn't you talk during the last trip she took?

"A.    Well, because my husband and I were away. We took a short vacation. We went to Hawaii. And because of the time zone and because Claire also had to go away during that time frame, and there was a different time than our home town, it was difficult for us to get in touch easily.

"Q.    When is the last time, ma'am, that you saw your daughter alive?

"A.    Last time I saw her alive was early in the morning, Friday April, 17th when she took my husband and I to the airport.

"Q.    Is that when you left for the airport?

"A.    Yes.

"Q.    She took you to the airport, dropped you off?

"A.    Yes.

"Q.    Was your daughter ever—you already told us she was very diminutive, very small? Did she bruise easily?

"A.    No.

"Q.    When is the last time that you had occasion to see her legs?

"A.    Thursday night before I left.

"Q.    How did that come about?

"A.    It came about because Claire Marie had gone to a sale at one of the stores, and she bought some clothing that she wanted to take on a trip, and she brought them over to our home to try them on and get my opinion on some of them, and decide what she would take and what she would not.

"Q.    Did you notice whether or not she had any bruises on her legs?

"A.    She didn't have a bruise on her body. I saw her whole body. We were trying on all kinds of clothes. She didn't have a bruise anywhere on her body. I can guarantee that.

"Q.    Okay. Was she into physical stuff, like one of these work out type people that's always doing things, or was it common to see bruises on her?

"A.    No, it wasn't common to see bruises on her. She would get into physical things, in a sense that she liked sports. She belonged to a gym. She had a life time membership—

"Q. When—

"A. —in a gym. She did go and work out at a gym.

"Q. When did you and your husband get back from your trip, vacation trip?

"A. We returned on Sunday, April 26th.

"Q. Okay. Did you check—was there any messages from your daughter on your machine at home, do you have a—

"A. We collected messages while we were away.

"Q. Had she called?

"A. Yes, she called.

"Q. Did she call—did you know when she had gone to Kansas City?

"A. Yes, we knew.

"Q. That had been the previous—what day?

"A. Thursday.

"Q. Before her death?

"A. Yes.

"Q. Did you have a message from Thursday?

"A. We had a message from Thursday evening that said she arrived safely, and to tell us what hotel she was staying at, give us the phone number and room number.

"Q. Was that common for her to do that kind thing?

"A. Absolutely. There was never a time she was away when she didn't call and tell us where she was, and give us a phone number and room number.

"Q. Did you know anything about her having switched hotels?

"A. I don't remember if she mentioned it in the phone call or not, but it was common for her to switch hotels which was why she always called us when she got there.

"Q. Why was that?

"A. If she didn't like the hotel.

"Q. Why would she switch?

"A. Because she was very fussy. She was very safety conscious. There were certain hotels that if she didn't like the looks of them, she didn't stay there, or if she didn't like the location or didn't like the configuration. And unfortunately, Prophet 21, they had a travel person who wasn't very detail oriented that way, and several times she was booked into a hotel which didn't meet her expectations or requirements.

"Q. Was exterior entrances to her room one of the issues?

"A. One big issue was she never wanted to stay in a place that had a door from the room out into the parking lot because she didn't feel it was safe for a young woman to park her car, get out and walk right into her room. She wanted to walk into a lobby and have someone see her come and go, know that she was there.

"Q. Did you—and obviously these are messages you retrieved when you get back Sunday night—or I'm sorry—retrieved—

"A. We retrieved them from Hawaii.

"Q. You were on vacation?

"A. Yes.

"Q. Did she call Friday or Saturday before her death?

"A. She called, I believe, it was Saturday morning. She was very happy, very upbeat. And she had been out in the morning and shopping in local stores, and saw a sale and she called and left a message to say that the Hyvee had aspirin on sale, and she knew my husband was in the habit of taking aspirin everyday, and would we like her to pick some up for us. She did that quite often, picked things up.

"Q. So just kind of common chat 'everything is okay'?

"A. Right. We were leaving voice mail messages back and forth because we didn't want to wake her in the middle of the night when it was convenient for us to call, and we didn't expect her to call us because of the expense involved.

"Q. When you got back, when was it that—when you got back on the Sunday evening, did you try to call your daughter?

"A. Yes.

"Q. And I take it you knew where she was staying 'cause of earlier messages?

"A. Yes.

"Q. And did—tell us about when you called what happened.

"A. It was about eight o'clock in the evening.

"Q. Is that your time?

"A. Our time back east.

"Q. Seven o'clock here then?

"A. Yes.

"Q. Eastern time?

"A. I didn't think about a time difference. I know it was eight o'clock our time eastern time. We were settled in. We had gotten home some time before that. We wanted to give Claire a chance to be back in her room. So we figured eight o'clock was a good time. So I call the hotel and I asked for her room, and at the time, there was silence on the other end, and the desk clerk said—asked me who I was, which I think was unusual. I didn't know what to say. So he said, "Wait a minute. I need to get someone else." And another person got on the phone, and I believe that was Detective Brown, and he asked—he told me who he was and, of course, my heart jumped, and then he said "I need to know who you are" so I told him that I was Claire's mother. And I asked was she okay. And he said, "There's been an incident in your daughter's room", and I said, "What kind" and he said, "I really can't say anything right now", he says, but I knew it had to be serious because otherwise why would the police be there, and so I got kind of shaky. I called my husband over. We were in the kitchen and I said, "I think you better talk to this man", and told him that it was a detective, and that they were in Claire's room and something happened, and he wasn't telling me what it was.

"Q. Did you find out that night, or was it the next day before you found out?

"A. We found out that night, but much later that night because we weren't getting a whole lot of information at first. Just that something happened and that

it was serious enough for the police to be there, and they were investigating, and they couldn't tell me anything else. So we waited—I made a couple phone calls back again because I thought we were waiting too long to get that information. And then about 10:30, I guess it was, that evening, there was a knock on the door, and it was the North Hampton Township police, policeman and policewoman. Of course, we knew that why else would they send—we let them in and they told us that she was dead.

"Q. Did you—

"A. They didn't tell us anything else. There was no details. They didn't know. They said there was an investigation. They couldn't say anything else. Just that she had died.

"Q. Did you and your husband then come to Kansas City?

"A. Yes. The next day on Monday, we spent most of the day on the phone with the police and answered all their questions they had to ask, and then when we caught a plane on Tuesday. We made arrangements for the night. On Tuesday—they told us that Monday. They didn't want us there Monday; that there was an autopsy going to be performed on the Monday, and after the autopsy, then they could tell us how she died. So they said it will be too soon for us to be there. We flew in on Tuesday, Tuesday afternoon. We saw the police on Wednesday.

"Q. Did they end up releasing some of your daughter's personal effects to you?

"A. On Wednesday, yes, Wednesday afternoon before we flew back home. They did release most of my daughter's belongings.

"Q. Including—and mainly I'm taking it that the things they released to you were articles of clothing, and maybe suitcase things they didn't feel were of evidentiary value, and other items?

"A. Yes. Everything that they released had already been checked out, dusted for fingerprints. Everything was black, you know.

"Q. Grimy black powder?

"A. Yes. And it was all in bags, and I repacked it in the police station.

"Q. Did they release your daughter's, I guess I'll call it, a purse? I don't know if that's right. State's Exhibit 18.

"A. Yes.

"Q. Can you identify that?

"A. Yes. This is my daughter's purse that she took on the trip. They did release this to me.

"Q. Some people call that a wallet on a string?

"A. It's called a wallet on a string. Yeah.

"Q. And I asked you to bring that to Kansas when you all came here for the trial?

"A. Yes.

"Q. And there's been some testimony in this case earlier about some things found in your daughter's suitcase and in that wallet. I would like for you to tell

the jury when you got back home or when you opened your—opened that wallet up, what you found in that wallet?

"A. Well, the first thing I saw when I opened the wallet up was the card from the hotel that had her room number on it.

"Q. Just so we understand, we are not talking about a plastic entry key card. We are talking about another kind of card?

"A. The folder that the key card goes in.

"Q. So it's just a folder from Howard Johnson, and did it have a number written?

"A. It had Room Number 207 written on it, and it had the full name and address and phone number of the hotel.

"Q. Okay. Is that the kind of thing when you walk in, they won't tell you the room number; they'll write it down, slide it to you?

"A. Yes.

"Q. That was right on top?

"A. Right on top.

"Q. Okay.

"A. First thing I saw.

"Q. All right. Was your daughter—did she drink?

"A. No. She was not a drinker.

"Q. Now, you know there's—I'm not sure how I know to take that. Did she ever drink?

"A. Did she ever take a drink, yes. She took a drink.

"Q. You are telling the jury she was not a big drinker type?

"A. She didn't like to drink, quite frankly. She would drink certain kinds of wines. She might drink a mixed drink, and she tried beer. She didn't really care for it. She would drink it when she was with her friends. She was not a heavy drinker. She drank very very little of anything alcoholic.

"Q. Did she like to dance?

"A. She loved to dance. It was exercise for her and it was a stress reliever. She worked very hard and she felt she needed to get out and be active.

"MR. MORRISON: If I could have just a minute.

"Q. (By Mr. Morrison) Did you—when you brought your effects, did your daughter come home with you as well? She was buried back east?

"A. She was already on an airplane before we got here. Her body was already on its way back.

"MR. MORRISON: Okay. I don't think I have anything further. Thank you, Ms. Monti.

"THE COURT: Mr. Gyllenborg.

"MR. GYLLENBORG: I have no questions of this witness."

A portion of the mother's testimony went to the fact that her daughter was very safety conscious when she traveled and a meticulous and fastidious person in organizing the details of her life.

The prosecutor alluded to this evidence in closing by pointing out that Henry's testimony regarding the events of the murder was inconsistent with the physical evidence and Monti's personal habits as testified to by her mother:

"How did [Rails and Henry] get into that room? I don't think they got—I don't think Claire Marie Monti let them in that room. The most important piece of evidence in this case, Carl Dean Rails' business card that he'd given to her that night, where was it found? Wasn't it found in her wallet? No. It had been taken out of her wallet and zipped in another part of that suitcase. Her wallet was zipped in that suitcase. Her wallet that's right in the top had the card, room card that said 'Room 207' laying right on top that anybody was drinking could have probably seen, that was drinking with her that night. You know what that tells us. I think the fact that card [and] her wallet are separated and zipped in different parts of her suitcase tells us she's in for the night that night. Is somebody that has guests in their room they are going to be making out with and everything going to sit there and take things out of their wallet, put it away? No. Not to mention that Mr. Rodney Wayne Henry, Jr., here also says she didn't do that. I think she was in that room for a while, and somehow they got in. We'll probably never now how. Somehow they got in. These guys weren't going to leave her alone. They had been buying her beers all night. They had her out there on the dance floor and grinding up against her, he's grinding against her rear end on the dance floor. They are going to get something for that that night . . . . How do you think she got these injuries we talk about premortem and postmortem injuries? How do you think she got these on her knees? How do you think she got stomped on her chest that's got fabric patterns on it? Because she was clothed when it started, but she wasn't clothed when it was over. You'll notice there were no fabric patterns on those knees. Those injuries were around her knees, and here is how they came. You get those kind of injuries on your knees and left elbow and this kind of injury to your right if you're down on the floor like this (indicating) and somebody's got your arm and they're hitting on the back of your head, and your chin drives into the carpet. That's how you get that burn on your chin because you're being raped and sodomized while you're very much alive while two people are doing it, two people are doing it, cranking that arm up while driving her down into that carpet, and you're tearing her anus while you're doing it. It couldn't have happened how he says it happened. It's impossible. It is absolutely impossible."

Finally, Henry contends that the prosecutor further erred by referring to the mother's testimony and urging the jury in closing argument to "think about Mother's Day yesterday, her mom how she must have felt. How Claire Marie Monti will never have a chance to be a mother, this young professional sharp, security conscious woman . . . ."

The prosecutor's reference to the mother's grief and the introduction of the mother's testimony was not relevant to whether the defendant was afflicted by mental disease or defect at the time of the alleged crimes. The prosecutor clearly intended to inflame the passion and prejudice of the jury. The testimony and comments substantially affected the defendant's right to a fair trial and was prosecutorial misconduct. The introduction of this evidence and the prejudicial references to this evidence is sufficient to require reversal of the defendant's conviction under the circumstances; therefore, this court need not determine whether the other incidences of prosecutorial misconduct would also require reversal.

Reversed and remanded for a new trial.