NOT DESIGNATED FOR PUBLICATION

No. 118,776

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RAVEN S. MCGEE-DARBY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed April 26, 2019. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., SCHROEDER, J., and STUTZMAN, S.J.

PER CURIAM:  A jury convicted Raven McGee-Darby of the rape and aggravated battery of his girlfriend, S.S. He now appeals, arguing that the trial court erred by excusing a prospective juror for cause and that the State committed reversible error in its closing argument. For the reasons stated below, we affirm.

In January 2017, McGee-Darby and S.S. lived together with their one-year-old son in a single bedroom of a home. The couple and their son slept on a makeshift pallet in the

1

bedroom. The couple shared a single truck for transportation to their respective jobs. McGee-Darby worked in roofing and S.S. worked at a gentleman's club.

On January 18, 2017, S.S. was scheduled to work a shift at the club that evening. She needed to shower and shave her legs before going into work. After showering in the bathroom shared with other occupants of the house, S.S. returned to the couple's bedroom and asked McGee-Darby for the keys to the truck so she could go to work. McGee-Darby told her that she could not go to work unless she engaged in oral sex or intercourse with him. She said no, explaining that she was running late for work and that she did not want her pay docked for being late.

S.S. went to get the keys from McGee-Darby, and he pulled her head to his crotch by pulling on her hair. She again said that she did not want to give him oral sex; she just wanted to get to work. She tried to pull her head away from his crotch, but he pulled her hair harder.

The struggle escalated and the couple ended up on the floor with McGee-Darby on top of her. S.S. was wearing elastic-waisted pajama pants; McGee-Darby pulled down the pants while S.S. tried to pull them back up. S.S. told McGee-Darby that she did not want to have sex and she wanted him to stop. S.S.'s legs were pinned under McGee-Darby's chest. McGee-Darby forcefully raped S.S.

S.S. did not go to work after the attack because she would have been late and had her pay docked. S.S. left the bedroom and went into the kitchen. There, she spoke to another resident of the house about cutting off her hair because she no longer wanted McGee-Darby to be able to pull her around by her hair. McGee-Darby then came out of their bedroom and asked S.S. why she was in the kitchen; S.S. went back to their bedroom.

2

After S.S. returned to the bedroom, McGee-Darby left the house to get cigarettes. The other occupants of the house decided to lock McGee-Darby out of the house because they could tell from S.S.'s demeanor and stated desire to cut off her hair that something had happened between the couple. S.S. asked the other occupants to let McGee-Darby back in the house, and they did so.

Once back in the house, the couple returned to their bedroom and McGee-Darby shut the door. S.S. was laying on the couch. McGee-Darby told S.S. something along the lines of "he was going to fuck [her] up before anybody else could help." Then, he either knelt or stood on the side of the couch and placed both his hands around S.S.'s neck and started squeezing. S.S.'s hands started to feel tingly and she panicked because she could not breathe. She then blacked out. She came to a couple minutes later with McGee-Darby slapping her in the face. When she came to, she was disoriented, her body and her tongue felt heavy, and her throat hurt. McGee-Darby accused her of having "faked" passing out. The couple's son was still in the bedroom with them when this incident occurred.

The next day, McGee-Darby left for work. S.S. spoke to the other residents of the house about the strangulation, but not about the rape. S.S. said that she was going to leave because of the physical abuse and that she was going to do so that day while McGee-Darby was at work to avoid another physical confrontation. The other residents helped S.S. find a safe place to stay next door at one of their friends' homes.

That evening, McGee-Darby returned to the home and called the sheriff's office because the other residents of the home were not letting him in to retrieve his property. S.S. noticed the sheriff's deputies and came over from the neighbor's home to speak to them about the situation with McGee-Darby's property. Sheriff's Deputy Jason Winn noticed that S.S. had a swollen nose and marks on her neck; S.S. admitted to him that McGee-Darby had hit and strangled her. Deputy Winn asked S.S. to write out an account of how she was injured for a police report. Next, Deputy Winn took pictures of S.S.'s

3

injuries. After taking pictures, Deputy Winn reviewed S.S.'s statement and realized that she disclosed having been raped as well as strangled. Deputy Winn sent over a female deputy, Erika Theis, to speak with S.S. about her rape allegations.

S.S. spoke with Deputy Theis and disclosed that McGee-Darby had raped her. Deputy Theis arrested McGee-Darby. The sheriff's deputies then brought S.S. downtown to make a statement. There, S.S. spoke to a detective and recounted the rape and strangulation.

Afterwards, S.S. underwent a sexual assault examination performed by a sexual assault nurse examiner (SANE), Tina Peck. S.S. told Peck about the rape, strangulation, and an incident a week before when McGee-Darby hit S.S.'s nose with his fist, causing it to bleed and later swell.

On January 24, 2017, the State charged McGee-Darby with aggravated battery, a level 7 felony. On March 8, 2017, the State amended the charges to add one count of rape, a level 1 felony; and one count of attempted aggravated criminal sodomy, a level 3 felony. On October 2, 2017, the State again amended the charges and added a count of misdemeanor domestic battery.

The case proceeded to a jury trial beginning on October 2, 2017. The parties engaged in more than a full day of voir dire to select the jury. The trial court started with a pool of more than 36 potential jurors. In response to a question by the State, 20 of those potential jurors admitted that domestic violence had touched their lives in some way. Some potential jurors explained in open court how domestic violence had impacted their lives, others preferred to answer in private proceedings with only the parties and trial court judge present. One such potential juror was a man with the initials J.C.

4

During the State's voir dire, J.C. admitted that he and his ex-wife had had a tumultuous marriage wherein they both accused each other of domestic violence. He referred to the relationship as "one of those things where two wrong people get together. It's just like gasoline." He said that he and his ex-wife used 911 "as a tool" against each other. He said that he felt the military justice system, which had jurisdiction over him, treated him unfairly because "[n]o matter what happened, [he] was always the one carted off."

The State asked J.C. if it should be concerned that he could not afford both sides a fair trial. J.C. responded:  "Fair? Fair isn't a problem." The State clarified: "Ok. What's the problem?" J.C. responded "Just—just—it's very emotional." He went on to explain that as a result of the domestic violence, his ex-wife secured a restraining order against him and to this day, he does not know where his 16-year-old son is.

The following exchange ensued:

> "[State]: Is this the type of case that you think that you might judge with emotion more than reason because it's so close?
> "[J.C.]: I know that for a fact because I'm a very emotionally driven person. I just know that for myself. So when things get emotional, I kind of get irrational and I don't like that.
> "[State]: Okay. Could that have an impact on your ability to come to a verdict?
> "[J.C.]: I don't know."

J.C. also added that he had to take a prescription that made him sleepy if he was sedentary. He said that he was worried the medication would make him fall asleep if he remained seated too long while serving on the jury.

Then, McGee-Darby's counsel questioned J.C. Among other questions, he asked, "I don't think your emotions are going to overwhelm anything, are they?" J.C. responded, "No, sir."

The State moved to release J.C. from the prospective juror pool for cause. Defense counsel objected to the motion. The trial court granted the State's motion and dismissed J.C. for cause. The trial court stated that its largest concern was J.C.'s response that he becomes irrational when he becomes emotional. The trial court said that it was concerned that if J.C. were to serve as a juror on the case, "he would have difficulty following the law and base his decision in this case on emotion."

At trial, S.S. testified, providing her account of the rape as detailed earlier. She testified that when McGee-Darby strangled her, she was afraid he was going to kill her. She also testified about McGee-Darby hitting her in the nose with his fist a week before the rape.

One of the other residents of the home testified about observing S.S.'s neck injuries and her demeanor on January 18 and 19, 2017. Deputies Winn and Theis testified about taking S.S.'s statement and photographing her injuries. The State introduced nine photographs Deputy Winn took of S.S.'s injuries. Lieutenant Jonathan Gill, a detective, testified about interviewing S.S. downtown and sending her for examination by a SANE.

Peck testified about her examination of S.S. Peck testified that S.S.'s injuries and account of passing out were consistent with having been strangled. She also testified that the injuries to S.S.'s genitals constituted a "significant amount of trauma" and were consistent with forceful rape. The State introduced charts created by Peck during her examination of S.S., detailing S.S.'s injuries to her face, neck, and genitals. The State also introduced 25 photos that Peck took of S.S. during her examination.

6

McGee-Darby's counsel cross-examined all of the State's witnesses but rested without defendant testifying or presenting evidence.

During its closing, the State stated:

"So what do we know? The young lady that came in her[e] with purple hair and her face made up and the [*sic*] probably the prettiest dress she owned, underneath it all was broken. Her body language, her shoulders were bent over, her voice was so soft spoken and her body had a physical reaction when she had to recount what happened to her. She trembled and she cried, and the time she got the most emotional with you is when she had to say my son was right there and witnessed it all.

"You can consider her statement to you, her mannerisms in judging her credibility, but something else you have is Tina Peck, the sexual assault nurse examiner who came in here and told you everything she told me, the history was consistent with every injury that I saw. . . ."

The State asked the jury to convict McGee-Darby of domestic battery for hitting S.S. in the nose; of aggravated battery for strangling her; of rape for penetrating her without consent; and of attempted criminal sodomy for pulling her head towards his crotch without her consent.

During his closing, defense counsel stated:

"So the State said she came to court in her best dress. Maybe so. But it just shows that she doesn't always have good judgment about what can be the best dress because she was wearing a dress that you wear to prom. That was kind of pitiful in its own way, too. So the fact that she's pitiful or pitiable, too, that gives us concern, because are you going to look at [S.S.] and say, you know, because I feel sorry for her when she has emotions and is shaken, she could be making that up.

"I'm submitting to you she can because in that environment she has lived over 18 years. She has developed whatever kind of person, the person that she is. All of her life experiences have made her what she is, how she thinks, how she talks.

7

"So you have to say to yourself, could somebody get on the witness stand and not be truthful with me as a juror? Obviously the answer's yes."

Defense counsel focused his closing argument on questioning S.S.'s credibility and arguing that her injuries could have been caused by something other than rape and strangulation. He argued that the State did not prove the charges beyond a reasonable doubt.

The jury found McGee-Darby guilty of rape and aggravated battery and not guilty of domestic battery and attempted aggravated criminal sodomy. The jury concluded that both the rape and aggravated battery were acts of domestic violence. The trial court sentenced McGee-Darby to 176 months in prison for rape and 12 months in prison for aggravated battery, to be served concurrently.

*Did the Trial Court Abuse Its Discretion by Removing Prospective Juror J.C. for Cause?*

"'The purpose of voir dire examination is to enable the parties to select jurors who are competent and without bias, prejudice, or partiality.'" *State v. Woods*, 301 Kan. 852, 870, 348 P.3d 583 (2015) (quoting *State v. Reyna*, 290 Kan. 666, 686, 234 P.3d 761 [2010].) Under K.S.A. 22-3410(2)(i), a party may challenge a prospective juror for cause if the juror's "state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he can act impartially and without prejudice to the substantial rights of any party."

A trial court's ruling on a motion to remove a potential juror for cause is reviewed for clear error or abuse of discretion. *State v. Heath*, 264 Kan. 557, 587, 957 P.2d 449 (1998). A trial court abuses its discretion (1) if its bases its decision on an error of law; (2) if its factual conclusions are not supported by substantial competent evidence; or (3) if

no reasonable person would have taken the view adopted by the trial court. *State v. Bogguess*, 293 Kan. 743, 753, 268 P.3d 481 (2012). When reviewing a trial court's ruling on a motion to remove a prospective juror for cause, this court should "consider the entire examination, not just answers that favor one side over the other" and grant deference to the trial court judge's ability to evaluate the prospective juror's "demeanor and nonverbal communication." *State v. Carr*, 300 Kan. 1, 114-15, 331 P.3d 544 (2014), *rev'd on other grounds* 577 U.S. ___, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016).

Here, McGee-Darby argues that the trial court abused its discretion by removing prospective juror J.C. for cause. Specifically, he argues that the trial court's factual conclusions were not supported by substantial competent evidence. Substantial competent evidence is "'such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.' [Citation omitted]" *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019).

The State moved to release J.C. from the potential juror pool for cause. McGee-Darby's counsel objected to the motion. The trial court granted the State's motion and dismissed J.C. for cause. The trial court stated:

> "THE COURT:  Okay. Based on his responses, here, I'm concerned—the statement that he made that concerns me most is the statement about I feel emotional about the case and when I feel emotional, I make my decisions based on emotion rather than my words, rational thinking. I don't want to put words in your mouth, but I can't remember your precise words, but those were the words that he used or the meaning of the words that he used.
> "That leads me to believe that he would have difficulty following the law and base his decision in this case on emotion. Because of that, I will grant the State's motion. I will overrule the defense's objection. I will remove [J.C.] for cause."

9

On appeal, McGee-Darby contends that the trial court's "factual conclusion—that J.C. would not follow the law—was not supported by substantial competent evidence, and thus, its discretion was based on a mistake of fact." The State, on the other hand, argues that there is substantial competent evidence in the record for the trial court's conclusion that J.C. would decide the case based on emotion rather than following the law. Further, the State argues, caselaw establishes that when a potential juror gives contradictory answers to pretrial questionnaires and/or voir dire questions, this court is deferential to the trial court's assessment of the prospective juror's state of mind because the trial court is uniquely positioned to observe the prospective juror's body language and demeanor.

The State is correct. The record here contains substantial competent evidence for the trial court's conclusion that J.C. was likely to decide the case based on emotion rather than fact and the law. Defense counsel points out that when he questioned J.C., they engaged in the following exchange:

> "[McGee-Darby's attorney]: If there is similarities to your case and you generate feelings, are you able to say, you know what, I'm here to kind of judge this case? I'm one of 12 people. I'm not here to let my emotions see things improperly.
> "[J.C.]: Right.
> "[McGee-Darby's attorney]: You sound like a guy—you went through counseling, is that right?
> "[J.C.]: Right.
> "[McGee-Darby's attorney]: So you actually dealt with a lot of these things already?
> "[J.C.]: Absolutely.
> "[McGee-Darby's attorney]: You know what I look for, what I'll probably say in there is I need jurors to be brave because it's a hard thing to render a decision in this case.
> "[J.C.]: Uh-huh.
> "[McGee-Darby's attorney]: Unless they say they want to be a juror, it's a tough decision to make. It's going to be really tough for you because of your emotions, but I

10

guess what I'm wondering, I don't think your emotions are going to overwhelm anything, are they?

> "[J.C.]: No, sir.
>
> "[McGee-Darby's attorney]: But I think you are being pretty honest with us back here and I appreciate that.
>
> "[J.C.]: Yes, sir."

This exchange, however, does not render meaningless J.C.'s responses to earlier questions by the State where J.C. stated that the wounds from his violent relationship with his ex-wife were "still real deep." These wounds were deep, in part because he was still subject to a restraining order and to this day did not know where his son was. He also felt that he was treated unfairly by the military courts because "[n]o matter what happened, [he] was always the one carted off" even though the domestic violence was alleged to go both ways between him and his ex-wife. Additionally, he stated that he felt that the courts always decided that he was more at fault for the domestic violence because his ex-wife "really knew how to work the system." Accordingly, J.C. stated that he knew for a fact that he would "judge with emotion more than reason" because he is "a very emotionally driven person" and "when things get emotional, [he] kind of get[s] irrational." Given these statements, it is clear that substantial competent evidence existed in the record to support the trial court's conclusion that J.C. would become irrational if he served as a juror in this case and decide the case more on emotion than on fact.

The record here contains conflicting statements by J.C. about his ability to decide the case impartially and without prejudice. The State is correct that when a prospective juror makes conflicting statements in voir dire and/or pretrial questionnaires, the trial court has considerable deference to evaluate whether that prospective juror can truly decide the case impartially and without prejudice.

For example, in *State v. Carr*, one prospective juror, M.W., answered in the pretrial questionnaire that "he was morally opposed to the death penalty and could not

11

vote to impose it under any circumstances." 300 Kan. at 105. During voir dire, M.W. vacillated between confirming that he could never impose a death sentence even if instructed to do so and stating that he, in fact, could impose the death penalty if forced to do so by law. The State challenged M.W. for cause because of the conflicting statements. The trial judge then asked M.W.:

> "[W]hat I heard you say is you could do your job every step of the way of being a juror, but the good book comes above all in your mind and it says thou shalt not kill and vengeance belongs to the Lord and you could not cast a vote against the Bible; that is, to impose death on another human being." 300 Kan. at 105.

M.W. responded, "Yes, sir" and the trial court excused M.W. for cause. 300 Kan. at 105.

On appeal, R. Carr argued that the trial court erred by granting the State's motion to excuse M.W. for cause. Our Supreme Court held that the trial court did not abuse its discretion by excusing M.W. 300 Kan. at 114-15. Our Supreme Court noted that M.W.'s responses were inconsistent, but that he confirmed his unfitness to serve as a juror in his final response to the judge where he declared that he would not impose a death penalty because he "could not cast a vote against the Bible." 300 Kan. at 105. Our Supreme Court further noted, however, that "even if [M.W.'s responses] were less definite, we would defer to the district judge who was able to evaluate M.W.'s demeanor and nonverbal communication, here, whether he had stopped vacillating and given a clear answer." 300 Kan. at 115.

Our Supreme Court cited a long string of authority to support its finding that the trial court did not abuse its discretion, including *State v. Johnson*, 253 Kan. 75, 85, 853 P.2d 34 (1993). In *Johnson*, a prospective juror admitted four times during voir dire that "some of her friends in the Vietnamese community had been in trouble with the law and she had heard they were treated unfairly" and "this might be a problem for her." 253 Kan.

12

at 85. Nevertheless, she claimed that she could be "fair to both sides and understood she could not take her personal experiences into account." 253 Kan. at 85. Our Supreme Court held that the trial court did not abuse its discretion by removing the prospective juror for cause despite her claim that she could be fair to both sides. 253 Kan. at 85. Our Supreme Court reasoned that a "trial judge is in a better position than an appellate court to view the demeanor of prospective jurors as they are questioned." 253 Kan. at 85.

Here, given J.C.'s conflicting statements in the record about his ability to decide the case impartially, the trial court was in the best position to assess which set of statements was true; i.e., whether J.C. could decide the case on the basis of facts and law and not emotion. The trial court evidently concluded that J.C.'s claims that he still had deep emotional wounds from his own experience with domestic violence and became irrational when he became emotional, outweighed his later claim that he could decide this case fairly and without emotion. This conclusion is supported by substantial competent evidence in the record.

Accordingly, in light of *Carr* and *Johnson*, this court finds that the trial court here did not abuse its discretion by granting the State's motion to remove J.C. for cause. Further, because the trial court did not err by removing J.C. for cause, this court need not consider McGee-Darby's arguments about prejudicial error with respect to J.C.'s removal.

*Did the State Commit Reversible Error in its Closing Argument?*

Next, McGee-Darby argues that the State committed reversible error in its closing argument when it referenced S.S.'s appearance and demeanor while testifying. The relevant portion of the State's closing argument is as follows:

> "So what do we know? The young lady that came in her[e] with purple hair and her face made up and the probably the prettiest dress she owned, underneath it all was

13

broken. Her body language, her shoulders were bent over, her voice was so soft spoken and her body had a physical reaction when she had to recount what happened to her. She trembled and she cried, and the time she got the most emotional with you is when she had to say my son was right there and witnessed it all.

"You can consider her statement to you, her mannerisms in judging her credibility, but something else you have is Tina Peck, the sexual assault nurse examiner who came in here and told you everything she told me, the history was consistent with every injury that I saw. . . ."

McGee-Darby argues that in the quoted segment of the State's closing argument, the State "erred by appealing to the jurors' sympathies when [it] stated that the alleged victim was 'broken' underneath what was probably 'the prettiest dress she owned.'" McGee-Darby argues that this statement "move[d] the jury's attention away from the evidence and the controlling law and instead appeal[ed] to the passions of the jury" in such a way that it impacted the jury's verdict.

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

This court should therefore analyze McGee-Darby's claim of prosecutorial error in two steps. First, it must determine whether the statement constituted error.

Prosecutors enjoy wide latitude when delivering closing arguments. See *State v. Pribble*, 304 Kan. 824, 832, 375 P.3d 966 (2016). Nevertheless, "[p]rosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law." *State v. Baker*, 281 Kan. 997, 1016, 135 P.3d 1098 (2006).

14

McGee-Darby here claims that the State's comment that "[t]he young lady that came in her[e] with purple hair and her face made up and the probably the prettiest dress she owned, underneath it all was broken" was prosecutorial error. He argues:

"[T]he evidence does not show that [S.S.] 'was broken' underneath her dress, and it was impermissible for the prosecutor to paint her in such a way because the only purpose was to inflame the juror's sympathies and to play on their passions at the type of case she was alleging the defendant committed."

McGee-Darby cites only one case in support of his argument. He compares this case to *State v. Nesbitt*, 308 Kan. 45, 417 P.3d 1058 (2018). There, Nesbitt was convicted of rape, aggravated burglary, and felony murder after he broke into a 100-year-old woman's home and raped her, causing her to die 21 days later from her injuries. During the State's rebuttal to Nesbitt's closing, the State said:

"[The District Attorney] described to you kind of this picture of [the victim] in her house before the attack. A hundred-year-old family member appeared to be a gift to this family. They kind of treasured this kind of thing that they had. They had this older family member. She was happy. She was at home. And look at the change that occurs from that attack. Look how different that life became.

"The only mistake I would ask you to consider in this case is that [the victim] did not get to live out her final days on her terms. The defendant took that away from her." 308 Kan. at 50.

On appeal, Nesbitt argued that this statement was prosecutorial error because "the reference to [the victim] as a family 'treasure' amounted to an improper attempt to inflame the passions of the jury." 308 Kan. at 56. Our Supreme Court agreed that the statement was error because it "had no purpose other than inflaming the passions of jurors, distracting them from their task." 308 Kan. at 58. Our Supreme Court cited a

15

string of precedent wherein they "consistently reprimanded prosecutors for making similar comments appealing to emotions of jurors." 308 Kan. at 56. These cases included:

> "See *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014) (comment on victim's children no longer having a father improper appeal for sympathy); *Adams*, 292 Kan. at 67 (invoking sympathy for family of victim impermissible); *State v. Tosh*, 278 Kan. 83, 92, 91 P.3d 1204 (2004) (telling jurors to protect child victim from father by finding father guilty improper appeal to emotions), *overruled on other grounds by Sherman*, 305 Kan. 88; *State v. Henry*, 273 Kan. 608, 640-41, 44 P.3d 466 (2002) (prosecutorial error in closing argument: '[T]hink about Mother's Day yesterday, [how the victim's mother] must have felt. Now [the victim] will never have a chance to be a mother, this young professional sharp, security conscious woman.')." 308 Kan. at 56-57.

Here, the State argues that the challenged statement was not error. The State distinguishes the statement here from the one in *Nesbitt*, arguing that "[w]hereas the comment in *Nesbitt* had no legitimate purpose and was purely an appeal to the jurors' sympathies, the prosecutor in this case was reasonably commenting on the evidence." The State argues that it was merely "arguing that, notwithstanding her clothing and exterior appearance in the courtroom, the victim was still physically and emotionally fragile, as evidenced by her body language and demeanor on the witness stand."

The State is correct that the challenged comment here had more of a permissible purpose—encouraging the jury to consider the victim's demeanor as a signifier of credibility—than the challenged comment in *Nesbitt*. Nevertheless, the State's comment that S.S. was "broken" impermissibly appealed to the jurors' emotions and distracted from the facts of the case. Thus, it was prosecutorial error.

Having determined that the comment was error, this court must proceed to the second step of the *Sherman* analysis and determine whether the error prejudiced McGee-Darby's due process rights to a fair trial. *Sherman*, 305 Kan. at 109. To do so, this court

16

must apply the harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 22-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under this analysis, prosecutorial error is harmless and, therefore, does not require reversal "if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *Sherman*, 305 Kan. at 109.

Here, McGee-Darby argues that the error prejudiced his right to a fair trial; the State argues that the error was harmless. The State is correct that in light of the entire record, there is no reasonable possibility that the error contributed to the jury's verdict.

First, the trial court instructed the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." Appellate courts "generally presume jurors follow the instructions given them in the district court." *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 (2011). Accordingly, this court presumes that the jury here understood that the State's closing argument was not evidence to be considered when reaching a verdict.

Additionally, while the defendant is not required to remedy prosecutorial error at trial, the defendant here addressed the State's error at length in his own closing. He stated:

> "So the State said she came to court in her best dress. Maybe so. But it just shows that she doesn't always have good judgment about what can be the best dress because she was wearing a dress that you wear to prom. That was kind of pitiful in its own way, too. So the fact that she's pitiful or pitiable, too, that gives us concern, because are you going to look at [S.S.] and say, you know, because I feel sorry for her when she has emotions and is shaken, she could be making that up.

17

> "I'm submitting to you she can because in that environment she has lived over 18 years. She has developed whatever kind of person, the person that she is. All of her life experiences have made her what she is, how she thinks, how she talks.
>
> "So you have to say to yourself, could somebody get on the witness stand and not be truthful with me as a juror? Obviously the answer's yes."

When analyzing prosecutors' statements for prosecutorial error, "[c]ourts do not isolate the challenged comments; they consider them in the context they were made." *State v. Butler*, 307 Kan. 831, 865, 416 P.3d 116 (2018). Both the appropriate jury instruction and the defendant's rebuttal to the State's error suggest that when considered in context, the State's error did not impact the jury's verdict here.

Second, the jury convicted McGee-Darby of rape and aggravated battery but acquitted him of domestic battery and attempted aggravated criminal sodomy. This suggests that the jury did not simply take S.S. at her word out of pity, but instead, considered all the evidence before them to determine whether McGee-Darby was indeed guilty of each separate charge.

Third, the record contains significant evidence to support McGee-Darby's convictions; the State characterizes this as "overwhelming evidence of guilt." This evidence includes testimony from Peck, the SANE who examined S.S., and recounted the injuries to S.S.'s genitals and neck. Peck testified that the injuries to S.S.'s genitals constituted a "significant amount of trauma" and were consistent with forceful rape. The evidence also includes charts created by Peck during her examination of S.S., detailing S.S.'s injuries to her face, neck, and genitals, as well as 25 photos of S.S.'s injuries that Peck took during her examination of S.S. Additionally, the jury had before it nine photos of S.S.'s face and neck taken by Deputy Winn.

Accordingly, in light of the entire record, we find that there is no reasonable probability that the State's error in closing impacted the jury's verdict in this case. As a

result, we determine that the challenged comments were harmless beyond a reasonable doubt and do not require reversal.

Because neither the exclusion of prospective juror J.C. for cause nor the State's comments in closing require reversal, we affirm.

Affirmed.